## KREMER et al. v. UNITED STATES.
### No. 47373.

United States Court of Claims.
March 6, 1950.

Fred Armstrong, St. Louis, Mo., for the plaintiff.

Grover C. Sherrod, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Judge.

This is a suit for damages in connection with a construction contract.

The Kremer Construction Company, a partnership, under date of July 15, 1942, entered into a contract with the defendant to furnish the materials and perform the

work for construction of Artillery Booster Load Lines "R" and "S" at the Sangamon Ordnance Plant, Illiopolis, Illinois. For convenience the partnership will be referred to as plaintiff, notwithstanding the death of one of the partners, and the joining of his wife, the executrix of his estate, as one of the parties.

The lines were to be units consisting of 13 buildings each. The cost was to be $408,000, which was increased by change orders in the sum of $24,518.

The buildings varied from a gate house, which was a one-room guard shelter, to a building 61'6" x 60'.

There were at the time several other similar alphabetical lines that had been and were being constructed by other companies. Notice to proceed with the work on Line S was given on July 18, 1942, and on Line R on August 1, 1942.

There were some extensions of time and the lines were completed within the specified period as extended.

Some of the other construction companies had already completed similar contracts prior to the time plaintiff's construction began. Others were constructing them at the same time, and one contract was begun subsequent to the beginning of plaintiff's contract.

The work was to be conducted under the general direction of the James Stewart Corporation and Fugard, Olsen, Urbain and Neiler, Architect-Engineer-Manager, hereinafter referred to as the AEM, as representative of the contracting officer.

*First claim:* Prior to bidding on the project, the contractor had written AEM, on July 6, 1942, asking for drawings showing the plans for mechanical work.[1] It also made an oral request after the execution of the contract, but such plans were never furnished. Lay-out drawings of Lines R and S were furnished to the contractor. They indicated main water lines and water installations entirely surrounding the R and S areas with a single entrance

to each building. The defendant's assigned reason for not furnishing the mechanical drawings was that plaintiff's contract did not call for mechanical construction and as this was a war manufacturing enterprise it was necessary to withhold such plans for security reasons.

Other contractors were digging trenches in various parts of the area involved. The usual procedure is to open the trenches progressively, install the services promptly and backfill promptly so that the work of the contractors may be coordinated so as not to interfere unduly with each other.

On the question of whether this was done the testimony is conflicting. The trenches were six to eight feet from the buildings and at many points the dirt as excavated was thrown toward rather than away from the building. During the time the trench work was in progress and before the completion of the mechanical installations a strike was called by the mechanical men, including steamfitters and plumbers. The strike lasted about two weeks, during which time the trenches were open, some of them remaining open for sometime thereafter.

The contractor made complaint to superintendents or foremen supervising the trench work and also to the contracting officer and the AEM that the trench work was interfering with its work. On the other hand, the defendant made numerous complaints that the contractor's work was not being adequately supervised and that it was not properly manned with labor.

The specifications provided that the contractor should receive the concrete in an accessible location in hoppers which were to be provided by the contractor. There was considerable discussion between the contractor and the AEM as to whether the concrete was delivered at such locations as could be considered accessible, and also as to whether the method of digging the trenches and piling up the dirt interfered unreasonably with the contractor's work.

---

1. By mechanical work is meant provisions for water, plumbing, sewerage, heating, electricity, machinery and other installations not ordinarily considered building construction or "general work."

There is no doubt the contractor's work was made more difficult by this condition. It was compelled, in addition to the concrete, to unload a considerable amount of other building material, such as lumber, trusses, siding and roofing beyond the trenches and haul them over as needed alongside the building where such materials were to be used.

However, the record fails completely to show how much additional labor the contractor was obliged to obtain on account of transporting materials across the trenches on runways instead of by trucks, or what amount of additional expense the contractor incurred because of the open trenches.

■ Since the contractor had visited the site it had knowledge that other contract work, both of the kind which it was doing and mechanical work as well, was to be done during the same period, and it is doubtful under the decision of the Supreme Court in the case of United States v. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L. Ed. 44, whether plaintiff would be entitled to recover even if it had been able to show definitely what damages and expenses had been caused by the work of the other contractors. However, it is not necessary to determine this point since the testimony offered in proof of the amount of damages, if any, is wholly insufficient.

It may be added that this work was done in the early part of the war when conditions militated against the contractor as well as against the Government in its effort to carry out the over-all war preparations.

*Second claim:* The second part of plaintiff's petition involves a claim for damages for delays which it alleges the Government caused.

In the first place, the contractor claimed that it was delayed by the failure of the defendant to promptly provide the location for the buildings to be constructed. The contract drawings did not show the exact location for the buildings. It was necessary that the contractor be furnished a bench mark and location lines before it could commence work. Prior to signing the contract

Mr. Kremer, the contractor's representative, was on the site with the construction superintendent of AEM who informed Mr. Kremer that the necessary locations would be given within a day or two.

On July 18, 1942, the defendant gave the contractor notice to proceed. The contractor had its superintendent on the site July 20, 1942, prepared to proceed with the work. However, the locations were not furnished to the contractor until July 25, 1942, a delay of six days during which time the contractor was prevented from proceeding with the foundation work for the buildings.

The contractor made written request for a six-day extension of the time for completion, which the contracting officer denied, but which on appeal was allowed.

The record does not disclose whether the contractor had any men other than the superintendent of construction on the job during that six-day period.

There was also a claim for delay in the furnishing of reinforcing steel. The contractor made request on the defendant for such steel for the building foundations. The defendant did not have the steel on hand and there was material delay before it was received by the contractor. However, extensions of time were allowed covering such period of delay. This delay in furnishing the steel delayed the pouring of concrete and necessitated the use of other methods of pouring the concrete than had been anticipated. The defendant agreed to furnish the contractor second-hand form material without cost. There was some delay in the furnishing of this material, but an appropriate extension of time of eight days was allowed.

The contractor contends that the defendant by its work order Schedule No. 110 issued a new set of plans materially changing the contract work and that the contractor was entitled to an extension of time on that account. This Schedule No. 110 did make certain changes in the contract work, such as omitting interior trim and revising door sills at certain places; it also directed the application of metallic floor hardener in certain buildings and directed a change in the

concrete slabs, omitted window and storage room, and relocated the hot water tank; pipe trenches, pump pit and tank platform were added in the boiler room. For these changes, however, the contractor was allowed an increased price of $16,521, which it accepted. There was also granted an additional period of four days on each line. A further change order was made which extended the time for completion 14 calendar days.

The plaintiff also asserts damages for the delay in plaintiff until cold weather arrived. It also claims that there was delay in furnishing certain millwork, including doors that were ordered and which the Government commandeered for other projects under higher priority. The record does not establish any substantial or material delay in the matter of doors or millwork.

Plaintiff claims that the various delays in furnishing the materials which the defendant was obligated to provide made it necessary for the contractor to hire additional men at greater cost in order to expedite the work. At the same time the contracting officer was complaining that the contractor did not have enough men to do the work properly.

Liquidated damages were assessed against the contractor but on appeal enough extensions in the contract period were granted to avoid the contractor's being subjected to any assessment of liquidated damages.

█ The state of the record is very unsatisfactory. Many of the claims for damages which plaintiff asserts were due to wartime conditions which prevailed at the time the contractor entered into the contract and which were the fault of no one, and for these delays there can be no recovery. While there is some evidence to indicate that some of defendant's representatives might have been responsible for some of the contractor's troubles, it is not necessary to finally determine the question one way or another, because no substantial evidence is offered upon which to base any definite amount of extra costs which may have been caused by the situation which we have described, and which is more fully set out in the findings. The books and records of the Kremer Company were not placed in evidence, and there is no sufficient evidence upon which to base a finding as to even the approximate amount of additional costs which the contractor may have incurred by virtue of the difficulties which it faced or because of the action of any of defendant's representatives.

█ Apparently a portion of this delay was attributable to the defendant and a portion to the contractor. There are no accounting records to prove how much of the delay was attributable to the contractor and how much to the defendant. Any attempt in the state of this record to allocate the portion of the delay attributable to either party would be purely speculative. There is one ground and one ground only upon which the plaintiff is entitled to recover. That is the fact as established by the record that the defendant's representatives, with full knowledge of the necessity of having the bench marks showing the location of the buildings before the contractor could proceed with the foundation work, nevertheless on July 18, 1942, gave notice to the contractor to proceed. They did this with full knowledge that the contractor expected to begin work on July 20, but notwithstanding this fact the bench marks were not furnished until July 25, which caused a delay of six days. However, the record only shows that the contractor had his superintendent with him on July 20 when the work was supposed to begin. It is possible that other men were available at the time, but the record does not disclose whether or not they were present, and of course no allowance can be had for any expenses except the salary of the superintendent for the six-day period. The plaintiff is entitled to recover the proportionate part of the superintendent's salary which was expended for that six-day period. On none of the other items, in the state of this record, is it entitled to recover.

It may be added that something of an excuse for the state of this record is the fact that Mr. Daniel H. Kremer, who had active charge of this operation, died before the

testimony was taken, and no one else seemed familiar enough with the project to give definite evidence in reference to these various claims.

Since we are unable to determine the amount of the superintendent's salary from the record, entry of judgment is suspended pending the filing of a stipulation by the parties; or, in the absence of a stipulation, a report by a commissioner based upon specific evidence limited to the amount paid to the superintendent as a salary for such six-day period.

HOWELL, MADDEN, WHITAKER, and LITTLETON, JJ., concur.